**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

FORGET ME NOT FASHIONS, LLC;
DOMINIKA J. MACIEJKA; GARY S.
HUBAND D.B.A. GARY S. HUBAND, AND
GARY S. HUBAND, individually, and on behalf
of all others similarly situated,

                             Plaintiffs,

v.

QUICKSILVER CAPITAL, LLC; BUSINESS
CAPITAL, LLC; UNITED BUSINESS
FUNDING, LLC; MICHAEL PUDERBEUTEL;
JOHN MCCORMICK; NOLAN RYAN; AND
THE JOHN AND JANE DOE INVESTORS,

                             Defendants.

---

Docket No.:

**JURY TRIAL DEMANDED**

---

**CLASS ACTION COMPLAINT AND DEMAND FOR A TRIAL BY JURY**

Plaintiffs Forget Me Not Fashions, LLC. ("Forget Me Not"), Dominika J. Maciejka ("Maciejka"), Gary S. Huband d/b/a Gary S. Huband, and Gary S. Huband (individually) (collectively "Huband"), by and through their undersigned attorneys, individually and on behalf of all others similarly situated, allege as against Defendants as follows:

**NATURE OF THE ACTION**

1.    This is an action to save small businesses across the country from the predatory lending practices of Defendants.

2.    Defendants provide financing to Plaintiffs, and other small businesses, through what they call Merchant Cash Advance ("MCA") agreements.  For all intents and purposes, these agreements are unquestionably loans.

3.     Defendants, however, cannot call these transactions what they are (loans) because the whole point of their scheme is to avoid the usury laws of various states, including New York. Thus, in order to charge the unlawful and unconscionable interest rates they seek to charge, Defendants must call them by a different name.

4.     Despite the form of the transaction, the money advanced is absolutely repayable.

5.     To be sure, when its victims can no longer keep up with the onerous fixed daily payments, instead of honoring the terms of their own sham contract, Defendants engage in a series of childish games designed to antagonize, embarrass and intimidate them.

6.     Among their outrageous conduct, Defendants systematically blame the victim by accusing them of committing fraud when their sales decrease, and passing their victims around to an endless series of voicemails, long holds, and disconnections when they try to invoke the rights stated on their sham form. Even worse, Defendants use their victims as a source of personal amusement by forwarding them to their purported in-house counsel, "Frank Rizzo," a fictional character from the Jerky Boys.

7.     Defendants never intended to honor the sham form of the transactions. Instead, Defendants treat them as absolutely repayable loans with criminally usurious rates.

## **THE PARTIES**

8.     Plaintiff Forget Me Not Fashions d/b/a Paper Doll Vintage Boutique is a limited liability company organized under the laws of New York. Its principal place of business is located in Suffolk County, New York.

9.     Plaintiff Dominika J. Maciejka is an individual resident and citizen of New York.

10.     Plaintiff Gary S. Huband d/b/a Gary S. Huband is a sole proprietorship organized under the laws of California. Its principal place of business is located in Aliso Viejo, California.

11.     Plaintiff Gary S. Huband is an individual resident and citizen of California.

12.     Defendant Quicksilver Capital ("Quicksilver") is a limited liability company organized under the laws of New York.  Its registered agent is located at 111 Eighth Avenue, New York, NY 10011.  On information and belief, each of its members is a citizen and resident of New York.  Quicksilver was previously doing business as Max Advance, LLC.

13.     Defendant Michael Puderbeutel is a resident and citizen of New York.

14.     Defendant John McCormick is a resident and citizen of New York.

15.     Defendant United Business Funding ("UBF") is a limited liability company organized under the laws of New York.  Its principal place of business is located at 627 Horseblock Rd, Suite 201, Farmingdale, NY 11738.

16.     Defendant Nolan Ryan is a resident and citizen of New York.

17.     Defendant Business Capital ("BizCap") is a limited liability company organized under the laws of Delaware.  Its principal place of business is located at 1000 N. West Street, Suite 1200, Wilmington, DE 19801.

18.     Defendants The John and Jane Doe Investors are individuals and businesses that provide capital to fund the criminally usurious loans.  On information and belief, each of the John and Jane Doe Investors is a citizen of New York.

## **JURISDICTION**

19.     Each Defendant is subject to the personal jurisdiction of this Court because each Defendant regularly transacts business within the State of New York, has purposefully availed itself of the laws of New York for the specific transactions at issue, or has selected New York as the forum for all disputes related to the transactions.

20.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(d)(2), because (i) at least one member of the Class is a citizen of a different state than Defendants, (ii) the amount in controversy exceeds $5,000,000 exclusive of interest and costs, and (iii) none of the exceptions under that subsection apply to this action.

21.     This Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 based on Plaintiffs' claims for violations of the Racketeer Influenced and Corruption Organizations Act, 18 U.S. C. §§ 1961–68.

22.     The Court has subject-matter jurisdiction over Plaintiffs' state-law claims because they are so related to Plaintiffs' federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

23.     This Court also has jurisdiction under 28 U.S.C. § 2201 *et. seq.*

24.     Venue is proper because each Defendant regularly conducts business within this judicial district.

## COMMON FACTUAL ALLEGATIONS

**A.      The Predatory MCA Industry.**

25.     As Bloomberg News has reported, the MCA industry is "essentially payday lending for businesses," and "interest rates can exceed 500 percent a year, or 50 to 100 times higher than a bank's."[1]  The MCA industry is a breeding ground for "brokers convicted of stock scams, insider trading, embezzlement, gambling, and dealing ecstasy."[2]  As one of these brokers

---

[1] Zeke Faux and Dune Lawrence, *Is OnDeck Capital the Next Generation of Lender or Boiler Room?*, BLOOMBERG (Nov. 13, 2014, 6:07 AM), https://www.bloomberg.com/news/articles/2014-11-13/ondeck-ipo-shady-brokers-add-risk-in-high-interest-loans.

[2] *Id.*

admitted, the "industry is absolutely crazy. … There's lots of people who've been banned from brokerage.  There's no license you need to file for.  It's pretty much unregulated."[3]

26.    The National Consumer Law Center expressed the same payday lending concerns:

> Merchant cash advances operate very similarly to payday loans and have similar problems.  A lump sum of cash is taken out as an advance on a borrower's future sales.  The merchant then pays back this balance in addition to an expensive premium through automatic deductions from the merchant's daily credit card or debit card sales or from its bank account.[4]

27.    As reported by CNN, "[m]any business owners take out new advances in order to pay off outstanding balances on previous advances, plunging them into a cycle of debt."[5]

28.    The New York State Department of Financial Services has recognized "the harmful impact of high-interest payday loans that trap consumers in a cycle of increasing debt and predatory collection practices," and has vowed "to protect New Yorkers from unscrupulous practices and [] oppose any attempt to evade New York's laws."[6]

29.    The New York Attorney General's Office has also acknowledged the damage these loans cause, stating: "[a]lthough many of these companies profess to offer cash-strapped consumers much needed access to loans, they typically charge exorbitant interest rates that essentially force struggling consumers to roll over one payday loan into another and that trap consumers in a vicious, never ending cycle of high-cost borrowing that they can never repay."[7]

---

[3] *Id.*

[4] National Consumer Law Center, Comments to the Comptroller of the Currency Office of the Comptroller of the Currency on *Exploring Special Purpose National Bank Charters for Fintech Companies*, National Consumer Law Center (Jan. 17, 2017)http://www.nclc.org/images/pdf/banking_and_payment_systems/ fintech/comments-fintech-jan2017.pdf.

[5] Octavio Blanco, *Controversial Cash Advances Come At A High Cost To Small Businesses*, CNNMONEY (Dec. 1, 2016, 2:28 PM), http://money.cnn.com/2016/12/01/news/economy/merchant-cash-advance/index.

[6] Letters from Maria T. Vullo, Superintendent, New York State Department of Financial Services, to the Honorable Thomas J. Curry, Comptroller, OFFICE OF THE COMPTROLLER OF THE CURRENCY (January 17, 2017 and April 14, 2017), https://www.occ.treas.gov/topics/responsible-innovation/comments/comment-nys-dept-financial-services.pdf.

[7] Letter from Jane M. Azia, Bureau Chief, Consumer Frauds and Protection, to the Honorable Thomas J. Curry, Comptroller, OFFICE OF THE COMPTROLLER OF THE CURRENCY (January 17, 2017), https://www.occ.treas.gov/topics/responsible-innovation/comments/comment-ny-atty-general.pdf.

30.    The National Consumer Law Center also recognized that these lending practices are predatory because they are underwritten based on the ability to collect, rather than the ability of the borrower to repay without going out of business.  National Consumer Law Center, *supra*.

31.    This is because MCA companies "receive the bulk of their revenues from the origination process rather than from performance of the loan [and thus] may have weaker incentives to properly ensure long-term affordability, just as pre-2008 mortgage lenders did." *Id*. ("[A] fundamental characteristic of predatory lending is the aggressive marketing of credit to prospective borrowers who simply cannot afford the credit on the terms being offered. Typically, such credit is underwritten predominantly on the basis of liquidation value of the collateral, without regard to the borrower's ability to service and repay the loan according to its terms absent resorting to that collateral.").

32.    The MCA companies only care about whether they can collect upon default, and not whether the small business can survive.

**B.    The Enterprise.**

33.    The Enterprise is comprised of Quicksilver, UBF, BizCap, Puderbeutel, Ryan and the John and Jane Doe Investors (the "Enterprise").

34.    Quicksilver, which is led and/or directed by Defendants John McCormick and Michael Puderbeutel, is one of a growing number of MCA companies whose entire scheme preys upon struggling small businesses.

35.    UBF, which is led and/or directed by Nolan Ryan, is a broker that solicits and sells loans for the Enterprise.

36.    BizCap is a broker that solicits and sells loans for the Enterprise.

37.    The John and Jane Doe Defendants provide the funding for the Enterprise.

**C.      The agreements are loans on their face.**

38.      Despite their documented form, the transactions are, in economic reality, loans that are absolutely repayable.  Among other hallmarks of a loan:

(a)      The Specified Daily Amounts were fixed and the so-called reconciliation provisions were mere subterfuge to avoid this state's usury laws.  Rather, just like any other loan, the Purchased Amount was to be repaid within a specified time;

(b)      The default and remedy provisions hold the merchants absolutely liable for repayment of the Purchased Amount.  The loans obligate the merchants to ensure sufficient funds are maintained in the Account to make the Specified Daily Amounts and, after four instances of insufficient funds being maintained in the Account, the merchants are in default and, upon default, the outstanding balance of the Purchased Amount is immediately due and owing;

(c)      While the agreements purport to "assign" all of the merchant's future account receivables to the Enterprise until the Purchased Amount is paid, the merchants retain all the indicia and benefits of ownership of the account receivables, including the right to collect, possess and use the proceeds thereof.  Indeed, rather than purchasing receivables, the Enterprise merely acquires a security interest in the merchant's accounts to secure payment of the Purchased Amount;

(d)      The transaction is underwritten based upon an assessment of the merchant's credit worthiness; not the creditworthiness of any account debtor;

(e)      The Purchased Amount is not calculated based upon the fair market value of the merchant's future receivables, but rather is unilaterally dictated by the Enterprise based upon the interest rate it wants to be paid.  Indeed, as part of the underwriting process, the Enterprise did not request any information concerning the merchant's account debtors upon which to make a fair market determination of their value;

(f)      The Specified Daily Amount is determined based upon when the Enterprise wants to be paid, and is not based upon any good-faith estimate of the merchant's future account receivables;

(g)      The Enterprise assumes no risk of loss due to the merchant's failure to generate sufficient receivables because the failure to maintain sufficient funds in the Account constitutes a default under the agreements;

(h)      The Enterprise requires that the merchants undertake certain affirmative obligations and make certain representations and warranties that are aimed at ensuring the company will continue to operate and generate receivables and a breach of such obligations, representations and warranties constituted a default, which fully protects the

Enterprise from any risk of loss resulting from the merchant's failure to generate and collect receivables;

(i)     The Enterprise requires that the merchant grant it a security interest in its receivables and other intangibles and, further that the individual owners personally guarantee the performance of the representations, warranties and covenants, which the Enterprise often knows are breached from day one.

## D.     The agreements are a sham.

39.     Even if the agreements are not absolutely repayable loans on their face, the agreements are a mere sham used to disguise the true nature of the transaction.

40.     Despite its documented form, the Enterprise intends to treat the transactions as absolutely repayable loans with fixed payment terms.

41.     At all relevant times, the Enterprise intended the Specified Daily Amounts to be fixed and absolutely repayable even if the business did not generate a single receipt.  Among other things, the Enterprise guarantees repayment by requiring the merchants to use the very funds advanced to repay the Enterprise even though the amount advanced is not, and cannot be, a "Future Sale" under basic notions of time and space.

42.     Further, at all relevant times, the Enterprise never intended to honor the so-called reconciliation provision in the agreements, which requires (if honored) the Enterprise to credit the merchant for any overpayment collected in excess of the Purchased Percentage.

43.     Rather than honor the terms of this so-called reconciliation provision, the Enterprise manufactures a litany of excuses as to why the merchant "does not qualify" for a reconciliation, when in fact, they do.

44.     The Enterprise also engages in unconscionable tactics designed to intimidate their victims from exercising their rights under the so-called reconciliation provision.

45.    Among other abusive tactics, the Enterprise accuses their victims of perpetrating a fraud and threatens to take legal action against their victims unless they continue to make the fixed daily payments.

46.    The Enterprise also verbally abuses their victims and gives them the runaround by placing them on long holds, pretending to discuss their account with the CEO of the company, pretending not to hear the merchant when they call, using fake names, directing the victim to other third parties for information, and when all else fails, simply hanging up on the victim, leaving them to endure the same painful cycle all over again.

47.    As alleged further below, the conduct of the enterprise shocks the conscience.

## **FACTS SPECIFIC TO PLAINTIFF FORGET ME NOT**

**A.    Forget Me Not and Maciejka.**

48.    Forget Me Not is a retail clothing company that once operated three locations in Sayville, Patchogue and Huntington.  It specializes in vintage clothing and accessories, as well as retro and novelty items.

49.    Forget Me Not opened its first store on May 19, 2012, and its third store on March 24, 2018.

50.    Forget Me Not is principally owned and operated by Maciejka.

**B.    The Enterprise Loan.**

51.    In June 2018, Forget Me Not sought financing from UBF.

52.    At that time, Forget Me Not needed financing to pay for merchandise at its store located in Sayville, New York, which does business as Paper Doll Vintage Boutique.

53.    To obtain financing from UBF, Forget Me Not filled out a one-page application on June 28, 2018.

54.     As part of the financing application, Forget Me Not submitted three months bank statements, showing a three-month average in deposits of $32,833.  The highest monthly deposits in any month was $34,500.

55.     Forget Me Not was approved for financing in the amount of $45,000.

56.     Under the terms negotiated by the parties, the Enterprise was supposed to advance $45,000 to Forget Me Not in exchange for the repayment of principal and interest of $60,750. *See* Ex. 1.

57.     At the inception of the transaction, Quicksilver intended repayment within a specified term determined by the number of daily payments required for full repayment.

58.     As additional consideration for making the loan, the Enterprise also charged a sham $900 "Origination Fee," a $395 "Platform Fee," a $1,295 "Broker Fee," as well as other miscellaneous fees.

59.     Even worse, Quicksilver deducted the first payment of $304 on the same day it funded the loan.  Thus, Quicksilver advanced a total of $43,505 on July 6, 2018, and then deducted $304 the same day, and then another $1,295 on July 10, 2018 for the "Broker Fee."

60.     To secure performance of the daily payments, Forget Me Not granted Quicksilver a security interest in certain of its assets and Maciejka was required to personally guarantee performance of the representations, warranties and covenants.

61.     In a unilateral attempt to disguise the true nature of the transaction, however, the Enterprise disguised the transaction as a sale of future receivables.

62.     Under the sham agreement, the fixed daily payment is disguised as a purported good-faith estimate of what would equate to 19% of Forget Me Not's daily deposits from its future receivables.

10

63.     Likewise, $304 does not represent a good-faith estimate of 19% of Forget Me Not's deposits from its daily receivables.  Instead, it is a unilateral term dictated by the Enterprise to disguise the true nature of the transaction.

64.     On the face of the agreement, the Enterprise intended to charge and receive a simple interest rate of at least 54%.

65.     The Enterprise's loans were funded, and collected, through the use of electronic wires.  Each instance of funding or collection was designed to give Forget Me Not the false impression that each agreement was a legal and enforceable transaction when it was not.

66.     At all relevant times, the Enterprise intended the transactions to be absolutely repayable loans over a fixed period of time.

67.     As explained to Maciejka on September 6, 2018, as far as Quicksilver was concerned, Quicksilver had advanced $45,000 and Forget Me Not was required to repay the advance over a fixed period of $304 per day—period.

68.     Quicksilver further explained, for example, "with us, with Quicksilver, again, if we give you a contract for $10,000 where the daily payment is $200 and it's for a six-month term, then basically, you have to pay $200 for six months until the advance is paid in full."

**C.      The Enterprise's sham reconciliation provision.**

69.     In an attempt to give the false impression that the transaction is not a loan, the Enterprise includes a so-called reconciliation provision in its sham contracts of adhesion.

70.     As demonstrated by the facts of this case, however, the so-called reconciliation provision is a complete sham that the Enterprise never intends to honor.

71.     On August 30, 2018, Maciejka and her partner Joseph Laspina called Quicksilver on a recorded line.  When she said she was calling for a reconciliation, she was transferred to

McCormick, the Risk Manager of Quicksilver.  When Maciejka read from the contract providing the right to a reconciliation, McCormick exclaimed:  "That's not what it says!  You must have an old version of that or something."  McCormick also got hostile with Laspina, claiming Laspina had screwed up because McCormick did not like his tone and as a result, he was no longer going to "cut [them] a deal."  McCormick also told Maciejka to get a new partner, and then transferred them to "Frank Rizzo," the fictitious attorney from the Jerky Boys.

72.    On September 4, 2018, after enduring a series of hostile and harassing phone calls with various Quicksilver employees, Maciejka sent a letter to Quicksilver, along with bank statements, demanding a reconciliation under Section 1.2.  The letter was refused by Quicksilver and returned as undeliverable so it was hand delivered on September 7, 2018.  Ex. 2.

73.    On September 5, 2018, Maciejka again called Quicksilver to follow up on her request for a reconciliation.  After being run around in circles and passed around from voicemail to voicemail, Maciejka finally spoke to McCormick on a recorded line.

74.    McCormick initially agreed to reduce the amount of the Specified Daily Amount to $50 per day to more accurately reflect the actual sales of Forget Me Not.

75.    A few minutes later, however, McCormick became belligerent when Maciejka asked Quicksilver to honor the reconciliation provision of its own contract by crediting Forget Me Not for the amount that Quicksilver had over-collected.

76.    McCormick replied:  "We gave you $45,000, and you think we give you money back, unbelievable.  Okay, we are not making a reduction.  I'm ending this conversation, I have nothing more to say."

77.    McCormick further falsely alleged that Forget Me Not was in default because it had missed three payments in a row (when it had never missed a payment).

78.    McCormick further made clear that the daily payment was absolutely fixed, stating repeatedly that Forget Me Not "signed a contract to pay us a certain amount daily."

79.    Incredibly, McCormick also told Maciejka that Forget Me Not did not qualify for a reconciliation because there was "too dramatic of a drop in sales, and that the CEO of the company had personally reviewed the bank statements."

80.    McCormick even suggested that Maciejka had committed fraud, asserting that the dramatic drop in sales "seems very odd."

81.    McCormick then tried to rely upon "principles," claiming that it if was his money and he was the one who lent it, he would be more than happy to reduce the payment.  But it was not his money (so he claimed), and that he would not be doing his job if he agreed to reduce the payments.  McCormick said that disciplinary action would be brought against him if he agreed to reduce payments, explaining:  "At the end of the day, there's millionaires investing into this company, and they lend it out to businesses nationwide, and the investors would wonder why it is not returning, and it comes down to this, letting people pay back slower."  He then hung up.

82.    Maciejka persisted because her business was on the line.  She continued to call Quicksilver, literally begging to speak with someone who would help.  Despite openly weeping on the phone due to the fear of losing her business, Maciejka was subjected to an outrageous campaign devised to evade and play childish games at her personal expense.  On one occasion, McCormick pretended not to hear Maciejka when she called.  On another, he pretended to be "Thomas," conspicuously changing his voice.  He would also send her to voicemail, place her on long holds, or simply hang up.

83.    As a direct and proximate cause of Quicksilver's failure to honor the reconciliation provision, Forget Me Not: (i) was forced to close its Huntington store; (ii) was

unable to purchase needed merchandise; (iii) has been late with payroll; (iv) has been unable to pay rent; (v) not been able to pay penalty fees associated with early lease termination of Huntington store; (vi) not been able to pay outstanding attorney fees for attorney hired to persistently but unsuccessfully negotiate with Quicksilver; (vii) not been able to pay sales tax; (viii) paid employee witholdings late; (ix) had to borrow personal funds from Maciejka; and (x) paid criminally usurious interest.

**C.      The Enterprise's Unlawful Confession of Judgment.**

84.      As a condition of the loan, Forget Me Not and Maciejka were required to execute an affidavit confessing judgment.

85.      In violation of N.Y. CPLR § 3218, the affidavit does not identify a single county in which judgment may be entered by confession.  Instead, it identifies all sixty-two counties in New York.  Ex. 3.

<u>**FACTS SPECIFIC TO PLAINTIFF HUBAND**</u>

86.      Huband is an accountant and operates as a sole proprietorship under the laws of California.

87.      In order to help with cash-flow, Huband opened a small line of credit with Expansion Capital on November 3, 2015.  The cost was exorbitant, and soon trapped Huband in a cycle of never-ending debt.

88.      Once trapped, Huband would soon resort to more MCA loans.

**B.      The Enterprise Loan.**

89.      On May 18, 2018, Huband was contacted by BizCap about consolidating his existing MCA debt.  BizCap made the following offer to Huband:

$32,000.00 for 180 business days (9 months) = $246.00 Daily Mon – Fri Only (4% Cheaper than the 25k Synergy Offer successfully securing the expected net requested while overall lowering your monthly responsibility)

This option would lower your payment from $576 to $246 daily saving you $330 per day/ $6,600 monthly.

The above qualifies for a renewal and term extension of $32k - $50k after 95 business days.

The above carries an ADJUSTABLE daily payment, "You lose business, we lower payments to cater"

     90.     In response, Huband sought clarification of the above offer.  BizCap explained:

There are roughly 21.5 business days in a month **(This investor uses 20 business days per month in their offer)**

9 x 21.5 = 193 payment days. **(9 x 20 = 180 payment days)**

193 x 246 = 47601. **(180 x 246 = $44,280)**

Am I paying 180 payments or 193? **(180 payments)**

What is the TOTAL payback? **(Total payback would be $44,160)**

     91.     These terms were also explained in the contract:

| | |
|---|---|
| **Funding Amount (A):** | $32,000.00 |
| **Payback Amount (B):** | $44,160.00 |
| **Bank Fee (C):** | $335.00 |
| **Filing Fee (D):** | $625.00 |
| **Payment Frequency** | Mon- Fri |
| **Estimated Term (A)** | 9 Months |
| **Daily Payment (B)** | $246.00 |

15

92.    Based on the representations above, Huband entered into an MCA agreement with Quicksilver on May 21, 2018.

93.    Under the terms negotiated by the parties, the Enterprise advanced $32,000 to Huband in exchange for the repayment of principal and interest of $44,160 through 180 Specified Daily payments of $246.  *See* Ex. 4.

94.    Thus, at the inception of the transaction, Quicksilver intended repayment within a specified term determined by the number of daily payments required for full repayment.

95.    As additional consideration, the Enterprise also charged a sham $640 "Origination Fee," a $395 "Platform Fee," a $335 "Bank Fee" and a $625 "Filing Fee."

96.    To secure performance of the daily payments, Huband granted Quicksilver a security interest in certain of its assets and Huband was required to personally guarantee performance of the representations, warranties and covenants under the transaction.

97.    In a unilateral attempt to disguise the true nature of the transaction, however, the Enterprise disguised the transaction as a sale of future receivables.

98.    Under the sham agreement, the fixed daily payment is disguised as a purported good-faith estimate of what would equate to 15% of Huband's daily deposits from future receipts.

99.    Likewise, $246 does not represent a good-faith estimate of 15% of Huband's daily deposits from future receivables.  Instead, it is a unilateral term inserted by the Enterprise to disguise the true nature of the transaction.

100.    On the face of the agreement, the Enterprise intended to charge and receive a simple interest rate of at least 64%.

101.    The Enterprise's loans were funded, and collected, through the use of interstate wires. Each instance of funding or collection was designed to give Huband the false impression that each agreement was a legal and enforceable transaction when it was not.

102.    At all relevant time, the Enterprise intended the transaction to be an absolutely repayable loan over a fixed period of time.

**C.    The Enterprise's Sham Reconciliation Provision.**

103.    On August 29, 2018, Huband sent Quicksilver a request for a reconciliation under Section 1.2 of the Agreement, along with a copy of his bank statements:

### GARY S. HUBAND
### Cash Basis Revenue
#### May 22 - July 31, 2018

|  | May 22-31 | Jun 2018 | Jul 2018 | Totals |
|---|---|---|---|---|
|  | $ 3,923.00 | $ 17,789.05 | $ 22,561.20 | $ 44,273.25 |
| Payments due @15% | $ 588.45 | $ 2,668.36 | $ 3,384.18 | $ 6,640.99 |
| Payments made | $ 1,722.00 | $ 5,166.00 | $ 5,166.00 | $ 12,054.00 |
| Difference | -$ 1,133.55 | -$ 2,497.64 | -$ 1,781.82 | -$ 5,413.01 |

104.    On September 3, 2018, Huband again sent Quicksilver a request for a reconciliation under Section 1.2 of the Agreement, along with a copy of his bank statements.

105.    On September 6, 2018, Huband then emailed BizCap as follows:

Your firm brokered a loan for me in May of this year through Quicksilver Capital.

As mentioned in your attached email and in Paragraph 1.2 of the Agreement, I have the option of requesting a reconciliation of the daily ACH payment to my the 15% of actual revenue realized on a monthly basis. Last week and again this week I submitted bank statements along with a statement of monthly revenue to Quicksilver via fax at 917-368-6943. Following my first fax on 8/29 I received only a list of payments without addressing my reconciliation request. The customer service phone number goes only to voicemail.

17

Please let me know the name, direct phone number and email address for the person handling these matters at Quicksilver so I can get this resolved without delay.

106.    Huband also sent emails to Quicksilver through its website, and tried calling

Quicksilver.  Nobody answered and it did not having a working voicemail.

107.    On September 11, 2018, Huband again emailed BizCap:

Your firm brokered a loan for me on 5/18/18 through Quicksilver Capital.

Your email to me at the time said I'd be protected should 15% of my revenue not be sufficient to cover the daily payment.

This is also spelled out in Paragraph 1.2 of the agreement.   See copies of both attached.

On 8/29/18 I faxed (confirmation received) Quicksilver a report of my actual revenues from 5/22-7/31 together with bank statements, indicating a significant deficit between 15% of my revenues and payments made.

On 9/3/18 I sent the same items covering the month of August.

To date I have received no response from Quicksilver to either my faxes or emails. Company's voicemails are not working.

I must receive a call from either your company or from Quicksilver Capital TODAY.  If not, I will be forced to take further action to protect my rights under the agreement.

108.    On September 16, 2018, Huband again sent Quicksilver the following by fax:

This is a follow-up on my previous requests from 8/29/18 and 9/3/18.

You replied to my original fax on 8/29/18 by sending me a transaction listing.  This is not what I requested, but it did confirm receipt of my fax.

In accordance with Section 1.2 of the Purchase and Sale Agreement dated May 18, 2018, I am asking for a reconciliation of receipts to payments for the period starting with the first payment date, May 22, 2018 through August 31, 2018.

My payments through 8/31/18 are in excess of 15% of my revenue by $7,504.  Terms of the Agreement require this amount to be credited back to my bank account.

Attached for your reference is a statement of cash revenue by month, and copies of my business bank statement for May-August.  Please be aware that the cash (tax basis) revenue by month will differ from bank statement deposits due to non-revenue items. Further deposit details can be provided upon request.

Phone calls to your customer service number (866-629-4464) are answered by computer and voice mail is not operating.

Emails to the loan broker, Business Capital LLC, have as well been unanswered.

I am in compliance with our Agreement.  I require the same compliance from your company.

109.    On September 17, 2018, Huband finally received a response from Quicksilver's Risk Manager, claiming that some of the pages faxed were blank.

110.    After emailing the bank statements again, Quicksilver responded:  "Thank you. Before going to paragraph 1.2 please read paragraph 1.1," apparently claiming that personal loans constitute a "Future Receipt."

111.    When Huband challenged this assertion, Quicksilver then claimed that Huband was in default by taking out additional MCA loans with other MCA companies.

112.    The assertion that Huband was in breach by taking out additional MCA loans is yet another sham excuse to avoid honoring the terms of the reconciliation provision.  Huband had never missed a payment, and the Enterprise's entire scheme is designed to force its victims into taking out additional MCA loans at even more onerous terms.

113.    As a direct and proximate cause of Quicksilver's failure to honor the reconciliation provision, Huband paid criminally usurious interest.

**C.    The Enterprise's Unlawful Confession of Judgment.**

114.    As a condition of the loan, Huband was required to execute an affidavit confessing judgment.

115.    In violation of N.Y. CPLR § 3218, the affidavit does not identify a single county in which judgment may be entered by confession.  Instead, it identifies all sixty-two counties in New York. Ex. 5.

## CLASS ALLEGATIONS

116.    Plaintiffs and the Putative Class Members repeat and re-allege the allegations of each of the foregoing paragraphs as if fully alleged herein.

117.    Plaintiffs bring this action pursuant to Fed. R. Civ. P. 23(b)(2) and 23(b)(3).

118.    Plaintiffs Forget Me Not and Huband bring this action individually and on behalf of classes of similarly situated persons defined as follows:

> **RICO Merchant Class:**  All persons in the United States who, on or after November 13, 2014 paid money to a member of the Enterprise pursuant to an MCA Agreement with an effective interest rate exceeding twenty-five percent.

> **Confession Merchant Class:**  All persons in the United States who, on or after November 13, 2014, executed an affidavit confessing judgment in violation of N.Y. C.P.L.R. § 3218 pursuant to an MCA Agreement with a member of the Enterprise.

119.    Plaintiffs Maciejka and Huband bring this action individually and on behalf of classes of similarly situated persons defined as follows:

> **RICO Principal Class:**  All persons in the United States who, on or after November 13, 2014, individually as a principal, paid money to a member of the Enterprise pursuant to an MCA Agreement with an effective interest rate exceeding twenty-five percent.

> **Confession Principal Class:**  All persons in the United States who, on or after November 13, 2014, individually as a principal, executed an affidavit confessing judgment in violation of N.Y. C.P.L.R. § 3218 pursuant to an MCA Agreement with a member of the Enterprise.

The following people are excluded from the Classes: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendants, Defendants' subsidiaries, parents, successors, predecessors, and any entity in which the Defendants or their parents have a controlling interest and its current or former employees, officers, and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise

20

released or waived; (5) Plaintiffs' and Defendants' counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

120.    **Numerosity**:  The exact number of members of the Classes is unknown and is not available to Plaintiffs at this time, but individual joinder in this case is impracticable. Based on publicly available documents, each of the Classes likely numbers in the thousands.

121.    **Commonality and Predominance**:  There are many questions of law and fact common to the claims of Plaintiffs and the other Class members, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class but are not limited to the following:

    a)  Whether the MCA Agreements are loans;

    b)  Whether the MCA Agreements are usurious;

    c)  Whether the MCA Agreements are void;

    d)  Whether Plaintiffs and the Classes may recover any moneys or property paid to the Enterprise pursuant to the MCA agreements;

    e)  Whether the affidavits confessing judgment violate N.Y. C.P.L.R. § 3218; and

    f)  Whether Defendants' conduct was willful or knowing.

122.    **Typicality**: Plaintiffs' claims are typical of the claims of the other members of the Classes. Plaintiffs and members of the Classes sustained damages as a result of Defendants' uniform wrongful conduct during transactions with Plaintiffs and the Classes.

123.    **Adequate Representation**: Plaintiffs have and will continue to fairly and adequately represent and protect the interests of the Classes, and have retained counsel competent and experienced in complex litigation and class actions. Plaintiffs have no interests antagonistic to those of the Classes, and Defendants have no defenses unique to Plaintiffs.

21

Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes, and they have the resources to do so. Neither Plaintiffs nor their counsel have any interest adverse to those of the other members of the Classes

124.    **Superiority**: This case is appropriate for certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. The injuries suffered by the individual members of the Classes are likely to have been relatively small compared to the burden and expense of individual prosecution of the litigation necessitated by Defendants' actions. Absent a class action, it would be difficult, if not impossible, for the individual members of the Classes to obtain effective relief from Defendants. Even if members of the Classes themselves could sustain such individual litigation, it would not be preferable to a class action because individual litigation would increase the delay and expense to all parties and the Court and require duplicative consideration of the legal and factual issues presented herein. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

### FIRST CAUSE OF ACTION
### (RICO:  18 U.S.C. § 1962)

**By Plaintiffs and the Classes against All Defendants**

125.    Plaintiffs and the Putative Class Members repeat and re-allege the allegations of each of the foregoing paragraphs as if fully alleged herein.

**A.    The Unlawful Activity.**

126.    More than a dozen states, including New York, place limits on the amount of interest that can be charged in connection with providing a loan.

22

127.    In 1965, the Legislature of New York commissioned an investigation into the illegal practice of loansharking, which, prior to 1965, was not illegal with respect to businesses.

128.    As recognized by the New York Court of Appeals in *Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 589 (1981), the Report by the New York State Commission on Investigation entitled An Investigation of the Loan-Shark Racket brought to the attention of the Governor and the public the need for change in both, as well as for change in the immunity statute, and for provisions making criminal the possession of loan-shark records and increasing the grade of assault with respect to the "roughing up tactics" used by usurious lenders to enforce payment."

129.    As a result of this Report, a bill was proposed to allow corporations to interpose the defense of usury in actions to collect principal or interest on loans given at interest greater than twenty-five percent per annum.

130.    This measure was deemed vital in curbing the loan-shark racket as a complement to the basic proposal creating the crime of criminal usury.

131.    As noted above, loan-sharks with full knowledge of the prior law, made it a policy to loan to corporations.

132.    The investigation also disclosed that individual borrowers were required to incorporate before being granted a usurious loan.

133.    Like here, this was a purely artificial device used by the loanshark to evade the law—an evasion that the Legislature sought to prevent.

134.    Among other things, the Report recognized that "it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted."

B.      Culpable Persons.

135.    Quicksilver, UBF, BizCap, Puderbeutel, McCormick, Ryan and the John and Jane Doe Investors (the "Investors") are "persons" within the meaning of 18 U.S.C. § 1961(3) and 18 U.S.C. § 1962(c) in that each is either an individual, corporation or limited liability company capable of holding a legal interest in property.

136.    At all relevant times, each of Quicksilver, UBF, BizCap, Puderbeutel, McCormick, Ryan and the Investors was, and is, a person that exists separate and distinct from the Enterprise.

137.    Quicksilver is a limited liability company organized and existing under the laws of the State of New York.

138.    Upon information and belief, Puderbeutel has a controlling ownership interest in Quicksilver, and is its Chief Executive Officer.

139.    Upon information and belief, McCormick is an officer of Quicksilver and holds the title of Risk Manager.

140.    Quicksilver solicits, underwrites, funds, services and collects upon lawful debt incurred by small businesses in states that do not have usury laws.

141.    UBF is a limited liability company organized and existing under the laws of the State of New York.

142.    UBF solicits the lawful debt incurred by small businesses in states that do not have usury laws.

143.    Upon information and belief, Ryan has a controlling ownership interest in UBF, and is its Chief Executive Officer.

144.    BizCap is a limited liability company organized and existing under the laws of the State of Delaware.

145.    BizCap solicits the lawful debt incurred by small businesses in states that do not have usury laws.

146.    Upon information and belief, the Investors are individuals and businesses organized under the laws of New York who fund lawful loans to small businesses in states that do not have usury laws.

**C.    The Enterprise.**

147.    Quicksilver, UBF, BizCap, Puderbeutel, McCormick, Ryan and the Investors, constitute an association-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c).

148.    Quicksilver, UBF, BizCap, Puderbeutel, McCormick, Ryan and the Investors are a group of persons that are associated-in-fact for the common purpose of carrying on an ongoing unlawful enterprise.  Specifically, the Enterprise has a common goal of soliciting, funding, servicing and collecting upon usurious loans that charge interest at more than twice the enforceable rate under the laws of New York and other states.

149.    Since at least 2016 and continuing through the present, the members of the Enterprise have had ongoing relations with each other through common control/ownership, shared personnel and/or one or more contracts or agreements relating to and for the purpose of originating, underwriting, servicing and collecting upon unlawful debt issued by the Enterprise to small businesses throughout the United States, including Forget Me Not, Huband and the Class Members.

150.    The debt, including such debt evidenced by the agreements, constitutes unlawful debt within the meaning of 18 U.S.C. § 1962(c) and (d) because (i) it violates applicable criminal usury statutes and (ii) the rates are more than twice the legal rate permitted under New York Penal Law §190.40.

**D.    Each Member's Role in the Enterprise.**

151.    The Enterprise has organized itself into a cohesive group with specific and assigned responsibilities and a command structure to operate as a unit in order to accomplish the common goals and purposes of collecting upon unlawful debts including as follows:

**i.    Defendant Puderbeutel**

152.    Puderbeutel is an owner and Chief Executive Officer of Quicksilver. On information and belief, together with McCormick, Puderbeutel is responsible for the day-to-day operations of the Enterprise and has final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan, including the loans extended to Forget Me Not, Huband and the Putative Class Members.

153.    In his capacity as a day-to-day leader of the Enterprise, Puderbeutel, together with McCormick, is responsible for creating, approving and implementing the policies, practices and instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to disguise the unlawful loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession used by the Enterprise to collect upon

26

the unlawful debt if the borrower defaults upon its obligations.  All forms were used to make and collect upon the unlawful loans including, without limitation, the loans extended to Forget Me Not, Huband and the Class Members.

154.    On information and belief, Puderbeutel has also taken actions and, directed other members of the Enterprise to take actions necessary to accomplish the overall goals and purposes of the Enterprise including directing the affairs of the Enterprise, funding the Enterprise, soliciting and recruiting members of the Enterprise, directing members of the Enterprise to collect upon the unlawful loans and executing legal documents in support of the Enterprise.

155.    Puderbeutel has ultimately benefited from the Enterprise's unlawful activity by receiving income from the proceeds of the Enterprise's funneling of the usurious loan proceeds to Quicksilver, UBF, BizCap, McCormick, Ryan and the Investors of the deals in which he has personally participated.

ii.    **Defendant McCormick**

156.    McCormick is the Risk Manager and Office Manager of Quicksilver.  Upon information and belief, together with Puderbeutel, McCormick is responsible for the day-to-day operations of the Enterprise and has final say on certain business decisions of the Enterprise including, without limitation, whether to honor a reconciliation request.  On information and belief, McCormick participated in, oversaw and ultimately approved the responses to the reconciliation requests by Forget Me Not, Huband and the Class Members.

157.    Upon and information and belief, in his capacity as a day-to-day leader of the Enterprise, McCormick, together with Puderbeutel, is responsible for creating, approving and implementing the instrumentalities used by the Enterprise to accomplish its common goals and purposes including: (i) the form of merchant agreements used by the Enterprise to attempt to

disguise the loans as receivable purchase agreements to avoid applicable usury laws and conceal the Enterprise's collection of an unlawful debt; (ii) the method of collecting the daily payments via ACH withdrawals; and (iii) form Affidavits of Confession used by the Enterprise to collect upon the unlawful debt if the borrower defaults upon its obligations.  All forms were used to make and collect upon the unlawful loans including, without limitation, the loans extended to Forget Me Not, Huband and the Putative Class Members.

158.    In this case, McCormick assisted the Enterprise with the collection of the usurious loans by responding to the repeated requests for reconciliation by Forget Me Not.  McCormick has also taken actions and, directed other members of the Enterprise to take actions, necessary to accomplish the overall goals and purposes of the Enterprise including sending emails and making telephone calls to collect upon the usurious loans.

159.     McCormick has ultimately benefited from the Enterprise's unlawful activity by receiving income from the proceeds of the Enterprise's funneling of the usurious loan proceeds to Quicksilver, UBF, BizCap, Puderbeutel, Ryan and the Investors.

**iii.    Defendant Quicksilver**

160.    Quicksilver is organized under the laws of New York and maintains officers, books, records, and bank accounts independent of UBF, BizCap, Puderbeutel, McCormick, Ryan and the Investors.

161.    Directly and through Puderbeutel, McCormick and its other agent employees, Quicksilver has been an active participant and central person in the operation and management of the Enterprise and its affairs, and in the orchestration, perpetration, and execution of the Enterprise's collection of unlawful debts.  Quicksilver has been and continues to be responsible for: (i) entering into contracts with brokers to solicit borrowers for the Enterprise's usurious

loans and participation agreements with Investors to fund the usurious loans; (ii) pooling the funds of Investors in order to fund each usurious loan; (iii) underwriting the usurious loans and determining the ultimate rate of usurious interest to be charged under each loan; (iv) entering into the usurious loans on behalf of the Enterprise; (v) servicing the usurious loans; (vi) setting up and implementing the ACH withdrawals used by the Enterprise to collect upon the usurious loans; and (v) obtaining judgments in its name to further collect upon the usurious loans.

162.    In this case, Quicksilver: (i) pooled funds from Investors to fund the usurious loans; (ii) underwrote the usurious loans; (iii) entered into the usurious loans; (iv) collected upon the usurious loans by effecting daily ACH withdrawals from the bank accounts of Forget Me Not, Huband, and the Class Members; and (v) serviced the usurious loans by responding to phone calls, and correspondence from the Forget Me Not, Huband and the Putative Class Members.

163.    Quicksilver ultimately benefits from the Enterprise's unlawful activity by, among other things, receiving a management fee from the proceeds of the unlawful debt from the Enterprise's funneling of the usurious loan proceeds to UBF, BizCap, McCormick, Ryan and the Investors, upon which Quicksilver has directly participated.

**vi.    Defendant UBF**

164.    UBF is organized under the laws of New York and maintains officers, books, records, and bank accounts independent of Quicksilver, BizCap, Puderbeutel, McCormick, Ryan and the Investors.

165.    Directly and through Ryan, and its other agent employees, UBF has been an active participant and central person in the operation and management of the Enterprise and its affairs, and in the orchestration, perpetration, and execution of the Enterprise's collection of

unlawful debts. UBF has been, and continues to be responsible for: (i) soliciting borrowers for the Enterprise's usurious loans; (ii) negotiating and entering into the usurious loans on behalf of the Enterprise; (iii) servicing the usurious loans; (iv) setting up and implementing the ACH withdrawals used by the Enterprise to collect upon the usurious loans; and (v) communicating with the merchants about the terms and conditions of the usurious loans.

166.    In this case, UBF: (i) solicited the usurious loan with Forget Me Not and the Putative Class Members; (ii) negotiated and entered into the usurious loan with Forget Me Not and the Putative Class Members; and serviced the usurious loan with Forget Me Not and the Putative Class Members. UBF has also taken actions and, directed other members of the Enterprise to take actions, necessary to accomplish the overall goals and purposes of the Enterprise including sending emails and making telephone calls to solicit the usurious loans.

167.    UBF ultimately benefits from the Enterprise's unlawful activity by receiving a fee from the proceeds of the unlawful debt from the Enterprise's funneling of the usurious loan proceeds to Quicksilver, BizCap, McCormick, Ryan and the Investors.

**vi.    Defendant Ryan**

168.    Ryan is the Senior Underwriter and Managing Partner of UBF. Upon information and belief, Ryan is responsible for the day-to-day operations of UBF and has final say on certain business decisions of the Enterprise.

169.    Upon and information and belief, in his capacity as a day-to-day leader of the UBS, Ryan has been an active participant and central person in the operation and management of the Enterprise and its affairs, and in the orchestration, perpetration, and execution of the Enterprise's collection of unlawful debts. Ryan has been, and continues to be responsible for: (i) soliciting borrowers for the Enterprise's usurious loans; (ii) negotiating and entering into the

usurious loans on behalf of the Enterprise; (iii) servicing the usurious loans; (iv) setting up and implementing the ACH withdrawals used by the Enterprise to collect upon the usurious loans; and (v) communicating with the merchants about the terms and conditions of the usurious loans.

170.    In this case, Ryan: (i) solicited the usurious loan with Forget Me Not and the Putative Class Members; (ii) negotiated and entered into the usurious loan with Forget Me Not and the Putative Class Members; and serviced the usurious loan with Forget Me Not and the Putative Class Members. Ryan has also taken actions and, directed other members of the Enterprise to take actions, necessary to accomplish the overall goals and purposes of the Enterprise including sending emails and making telephone calls to solicit the usurious loans.

171.    Ryan ultimately benefits from the Enterprise's unlawful activity by receiving a fee from the proceeds of the unlawful debt from the Enterprise's funneling of the usurious loan proceeds to Quicksilver, BizCap, McCormick, UBF and the Investors.

**vi.    Defendant BizCap**

172.    BizCap is organized under the laws of Delaware and maintains officers, books, records, and bank accounts independent of Quicksilver, UBF, Puderbeutel, McCormick, Ryan and the Investors.

173.    BizCap has been an active participant and central person in the operation and management of the Enterprise and its affairs, and in the orchestration, perpetration, and execution of the Enterprise's collection of unlawful debts.  BizCap has been, and continues to be responsible for: (i) soliciting borrowers for the Enterprise's usurious loans; (ii) negotiating and entering into the usurious loans on behalf of the Enterprise; (iii) servicing the usurious loans; (iv) setting up and implementing the ACH withdrawals used by the Enterprise to collect upon the

usurious loans; and (v) communicating with the merchants about the terms and conditions of the usurious loans.

174.    In this case, BizCap: (i) solicited the usurious loan with Huband and the Putative Class Members; (ii) negotiated and entered into the usurious loan with Huband and the Putative Class Members; and serviced the usurious loan with Huband and the Putative Class Members.

175.    BizCap ultimately benefits from the Enterprise's unlawful activity by receiving a fee from the proceeds of the unlawful debt from the Enterprise's funneling of the usurious loan proceeds to Quicksilver, UBF, Puderbeutel, McCormick, Ryan and the Investors.

**vii.    The Investors**

176.    The Investors are a group of organizations and individual investors who maintain separate officers, books, records, and bank accounts independent of Quicksilver, UBF, BizCap, McCormick, Ryan and the Investors.

177.    On information and belief, directly and through their members, agent officers, and/or employees, the Investors have been and continue to be responsible for providing Quicksilver with all or a portion of the pooled funds necessary to fund the usurious loans, including the loans to Forget Me Not, Huband and the Putative Class Members, and to approve and ratify the Enterprise's efforts to collect upon the unlawful debts by, among other things, approving early payoff terms, settlement agreements and other financial arrangements with borrowers to collect upon the unlawful debt.

178.    The Investors ultimately benefit from the Enterprise's unlawful activity when the proceeds of collecting upon the unlawful debts are funneled to the Investors.

E.    **Interstate Commerce**

179.    The Enterprise is engaged in interstate commerce and uses instrumentalities of interstate commerce in its daily business activities.

180.    Specifically, members of the Enterprise maintain offices in New York and Delaware and uses personnel in these offices to originate, underwrite, fund, service and collect upon the usurious loans made by the Enterprise to entities throughout the United States via extensive use of interstate emails, mail, wire transfers and bank withdrawals processed through an automated clearing house, including Forget Me Not, Huband and the Class Members.

181.    In the present case, the communications between the members of the Enterprise, Forget Me Not, Huband and the Class Members were by interstate email and mail, wire transfers or ACH debits and other interstate wire communications. Specifically, the Enterprise used interstate emails to originate, underwrite, service and collect upon the loans, fund the advances under each of the loans and collect the Daily Payments via interstate electronic ACH debits.

182.    In addition, at the direction of Quicksilver, loans were executed in states outside of New York, and original copies of the loans and the applicable Confession Affidavits were sent from states outside of New York to Quicksilver at their offices in New York via Federal Express using labels prepared by a member of the Enterprise.

F.    **Injury and Causation.**

183.    Plaintiffs and the Putative Class Members have and will continue to be injured in their business and property by reason of the Enterprise's violations of 18 U.S.C. § 1962(c), in an amount to be determined at trial.

184.    The injuries to Plaintiffs and the Putative Class Members directly, proximately, and reasonably foreseeably resulting from or caused by these violations of 18 U.S.C. § 1962(d)

include, but are not limited to, many millions of dollars in improperly collected criminally usurious loan payments.

185.    Plaintiffs and the Class Members have suffered damages by incurring attorneys' fees and costs associated with exposing and prosecuting Defendants' criminal activities.

186.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs and the Class Members are entitled to treble damages, plus costs and attorneys' fees from Defendants.

**SECOND CAUSE OF ACTION**
**(Conspiracy under 18 U.S.C. § 1962(d))**

**By Plaintiffs and the Classes against All Defendants**

187.    Plaintiffs and the Putative Class Members repeat and re-allege the allegations of each of the foregoing paragraphs as if fully alleged herein.

188.    Defendants have unlawfully, knowingly, and willfully, combined, conspired, confederated, and agreed together to violate 18 U.S.C. § 1962(c) as describe above, in violation of 18 U.S.C. § 1962(d).

189.    By and through each of the Defendants' business relationships with one another, their close coordination with one another in the affairs of the Enterprise, and frequent email communications among the Defendants concerning the underwriting, funding, servicing and collection of the usurious loans, including the loans to Forget Me Not, Huband, and the Putative Class Members, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise extended beyond each Defendant's individual role.  Moreover, through the same connections and coordination, each Defendant knew that the other Defendants were engaged in a conspiracy to collect upon unlawful debts in violation of 18 U.S.C. § 1962(c).

190.    Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs in order to collect upon unlawful debts,

including the Agreements, in violation of 18 U.S.C. § 1962(c).  In particular, each Defendant was a knowing, willing, and active participant in the Enterprise and its affairs, and each of the Defendants shared a common purpose, namely, the orchestration, planning, preparation, and execution of the scheme to solicit, underwrite, fund and collect upon unlawful debts, including the usurious loans to Forget Me Not, Huband, and the Putative Class Members.

191.    The participation and agreement of each Defendant was necessary to allow the commission of this scheme.

192.    Plaintiffs and the Putative Class Members have been and will continue to be injured in their business and property by reason of the Defendants' violations of 18 U.S.C. § 1962(d), in an amount to be determined at trial.

193.    The injuries to the Plaintiffs and the Putative Class Members directly, proximately, and reasonably foreseeably resulting from or cause these violations of 18 U.S.C. § 1962(d) include, but are not limited to, many millions of dollars in improperly collected usurious loan payments and the unlawful entry and enforcement of judgments.

194.    Plaintiffs and the Putative Class Members have suffered damages by incurring attorneys' fees and costs associated with prosecuting Defendants' criminal activities.

195.    Pursuant to 18 U.S.C. § 1964(c), Plaintiffs and the Putative Class Members are entitled to treble damages, plus costs and attorneys' fees from the Defendants.  The Court should also enter such equitable relief as it deems just and proper to preclude the Defendants from continuing to solicit, fund and collect upon unlawful debt.

35

## THIRD CAUSE OF ACTION
### (Fraud)

### By Plaintiffs and the Classes against All Defendants

196.    Plaintiffs and the Putative Class Members repeat and re-allege the allegations set forth above herein.

197.    Defendants fraudulently induced Plaintiffs and the Putative Class Members into entering into the usurious loans by representing, with the intent to deceive, that the transactions were sales of future receivables.

198.    At the time these representations were made, Defendants knew the representations were false because Defendants knew that the transactions were not sales of future receivables but were instead absolute repayable loans that required fixed daily payments until all principal and interest was fully repaid.

199.    Defendants also fraudulently induced Plaintiffs and the Putative Class Members into entering into the usurious loans by representing, with the intent to deceive, that the merchants were entitled to enforce the reconciliation provision of the loans by receiving a credit for any payments made in excess of the Specified Percentage of Future Receivables purportedly purchased.

200.    At the time these representations were made, Defendants knew the representations were false because Defendants had no intention of honoring the reconciliation provision.

201.    Plaintiffs and the Putative Class Members reasonably relied upon these representations to their detriment by paying criminally usurious interest and not receiving the benefits of the reconciliation provision.

202.    The conduct by Defendants was intentional, outrageous and in reckless disregard of the rights of Plaintiffs and the Putative Class Members.

36

## FOURTH CAUSE OF ACTION
### (N.Y. C.P.L.R. § 3218)

**By Plaintiffs and the Confession Merchant and Confession Principal Classes
against Quicksilver**

203.    Plaintiffs and the Putative Class Members repeat and re-allege the allegations set forth above herein.

204.    Pursuant to CPLR § 3218, a judgment by confession may be entered upon an affidavit executed by the defendant "stating the sum of which judgment may be entered, authorizing the entry of judgment, and stating the county where the defendant resides *or if a non-resident, the county in which entry is authorized*."  CPLR § 3218 (1)(a) (emphasis added).  Upon occurrence of any conditions precedent to its entry, judgment may be entered "with the clerk of *the* county *designed in the affidavit*."  CPLR § 3218(b) (emphasis added).

205.    The affidavits confessing judgment executed by Plaintiffs and the Putative Class Members violate the strict requirements of § 3218 because "the county" where judgment may be entered is not "ascertainable from the affidavit."

206.    Rather, the affidavits confessing judgment executed in connection with each loans identifies all sixty-two counties of New York.

207.    In other words, the affidavits give the debtor and its creditors advanced notice that judgment may be entered in any one of New York's four corners.  That is not and cannot be what the Legislature contemplated when it purposely amended New York's confession of judgment statute to ensure the "proper county" in which judgment may be entered "will be ascertainable from the affidavit."

208.    Accordingly, the affidavits confessing judgment are defective on their face.

### FIFTH CAUSE OF ACTION
**(New York Penal Law §190.40)**

**By Plaintiffs and the Classes against All Defendants**

209.     Plaintiffs and the Putative Class Members repeat and re-allege the allegations set forth above herein.

210.     The transactions between (1) Plaintiffs and the Class Members, and (2) Quicksilver, were not true sales of receivables.

211.     Instead, each of the transactions was a loan that charged an interest rate exceeding twenty-five percent.

212.     Quicksilver entered into each transaction with the specific intent of charging and receiving interest in excess of twenty-five percent.

213.     Each of the Agreements is a criminally usurious loan under N.Y. Penal Law § 190.40, and thus, void and unenforceable.

214.     Plaintiffs and the Class Members have involuntarily paid principal and interest on each of the Agreements for which they had no obligation to pay.

215.     The payments by Plaintiffs and the Class Members were involuntary because, under the full recourse protections provided by the loans, Quicksilver is entitled to compel repayment in the event of a non-payment by, among other default remedies identified in the loans, filing a confession of judgment against Plaintiffs and the Putative Class Members that confesses the full amount of both principal and interest, as well as attorney's fees and costs.

216.     In addition, if Plaintiffs and the Putative Class Members failed to pay as required under the loans, the full balance of the loan became immediately due and owing.

## SIXTH CAUSE OF ACTION
### (In the alternative, Breach of Contract)

### By Plaintiffs and the Classes against Quicksilver

217.    Plaintiffs and the Putative Class Members repeat and re-allege the allegations set forth above herein.

218.    Under Section 1.2 of the Agreements, Quicksilver had an obligation to credit Plaintiffs and the Putative Class Members for the amount it collected in excess of the specified percentage of future receivables purportedly purchased each month.

219.    Quicksilver did collect more than the specified percentage of future receivables purportedly purchased from Plaintiffs and the Putative Class Members, and Plaintiffs and the Putative Class Members timely provided the documentation required under Section 1.2.

220.    Despite their entitlement to a credit, Quicksilver failed to credit Plaintiffs and the Putative Class Members the amounts due and owing under Section 1.2 of the Agreements.

221.    As a direct result of Quicksilver's breach, Plaintiffs and the Putative Class Members have been damaged by, among other things, paying a higher rate of interest for the time value of the money advanced, as well as other direct and consequential damages.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment in their favor against Defendants, jointly and severally, and seek an order from the Court:

a)    Certifying this case as a class action on behalf of the Classes defined above, appointing Plaintiffs as Class representatives, and appointing their attorneys as class counsel;

b)    Declaring that the Agreements entered into between Class Members and Quicksilver constitute a loan transaction, and thus, are void because Quicksilver intended to charge and receive a usurious interest rate in excess of 25%;

c)    Declaring that the affidavits confessing judgment in connection with each of the criminally usurious loans violates N.Y. C.P.L.R. § 3218, and are thus void and unenforceable;

d)    Ordering Defendants to repay all principal and interest previously paid to Quicksilver in connection with the usurious loans, including prejudgment interest;

e)    Granting an injunction against Quicksilver permanently enjoining it from enforcing any of their rights under the usurious loans;

f)    Awarding the Plaintiffs and Class Members direct and consequential damages;

g)    Awarding Plaintiffs and the Class Members treble damages;

h)    Awarding Plaintiffs and the Class Members their attorney's fees and costs incurred in this action; and

i)    Granting such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs and the Putative Class Members demand a trial by jury on all issues.

Dated:  November 13, 2018

WHITE AND WILLIAMS LLP

By: _____

Shane R. Heskin
Justin E. Proper
7 Times Square, Suite 2900
New York, NY 10036-6524
(215) 864-6329
heskins@whiteandwilliams.com
*Attorneys for Plaintiffs and*
*the Putative Class Members*

41